**CAMBRIDGE STATE BANK,
et al., Respondents,**

v.

**John P. JAMES, Commissioner,
Department of Revenue, State
of Minnesota, Appellant.**

**NORWEST BANK DULUTH, NATIONAL
ASSOCIATION (formerly First National
Bank of Duluth), Respondent,**

v.

**John P. JAMES, in his capacity as
Commissioner of Revenue, and The
State of Minnesota, Appellant.**

No. C0–89–2097.

Supreme Court of Minnesota.

April 1, 1994.

Rehearing Denied May 16, 1994.

Gregory P. Huwe, Asst. Atty. Gen., Barry R. Greller, Sp. Asst. Atty. Gen., Tax Litigation Div., St. Paul, for appellant.

Christopher J. Dietzen, Larkin, Hoffman, Daly & Lindgren, James P. McCarthy, Laurence R. Waldoch, Lindquist & Vennum, Minneapolis, for Cambridge State Bank, et al.

Walter A. Pickhardt, Robert L. Schnell, Jr., Faegre & Benson, Minneapolis, for Norwest Bank Duluth.

GARDEBRING, Justice.

This challenge to the bank excise tax imposed by Minn.Stat. § 290.361 (1984) (repealed 1987)[1] is before us on remand from the United States Supreme Court for reconsideration in light of the Court's decision in *Harper v. Virginia Department of Taxation,* —— U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). *Norwest Bank Duluth v. McClung,* —— U.S. ——, 113 S.Ct. 3026, 125 L.Ed.2d 714 (1993) (remand order). We have considered this matter in two previous decisions. The lawsuit began in August of 1984 when over 140 banks filed a consolidated refund action in district court for the tax years 1979–83, pursuant to the tax refund statute, Minn.Stat. § 290.50, subd. 2 (1984) (recodified at Minn.Stat. § 289A.50, subd. 7 (1992)).[2] The banks alleged that the bank excise tax violated the Borrowing and Supremacy Clauses of the U.S. Constitution, as well as 31 U.S.C. § 3124 (1982), because it exempted from taxation the banks' income from certain state obligations while it taxed income from federal obligations.[3] The banks based their claim on the U.S. Supreme Court's decision in *Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 103 S.Ct. 692, 74 L.Ed.2d 562 (1983) which held that a similar Tennessee tax was unconstitutional.[4]

1. As we stated in our first decision in this case: Banks doing business in the State of Minnesota during the relevant period were required to pay a tax measured by their net income. Minn.Stat. § 290.361, subd. 1. That tax was governed by the provisions of Minn.Stat. § 290.02. *Id.* Both Minn.Stat. §§ 290.02 and 290.361 referred to an "excise" tax measured by taxable net income. Minn.Stat. § 290.08, subd. 8 (1984) (repealed 1987) exempted any interest earned on either United States or State of Minnesota obligations from gross income. That exclusion, however, *was not* applicable to "corporations taxable under section 290.02 *or 290.361." Id.* (emphasis added). Consequently, for banks doing business in the state of Minnesota, interest earned on federal obligations was *included* in the taxable net income figure used to compute their chapter 290 excise tax. *Cambridge State Bank v. Roemer,* 457 N.W.2d 716, 719 (Minn.1990).

2. Due to the applicable statute of limitations, the banks' refund claims were limited to the period from 1979 to the date of filing. The Minnesota legislature, however, had enacted provisions as early as 1957 overriding the bank excise tax and exempting interest earned on certain state bonds. *See* Act of April 24, 1957, ch. 603, § 2, 1957 Minn.Laws 753 (codified at Minn.Stat. § 136.32 (1978)) (revenue bonds issued by Minnesota

State University System); Act of May 4, 1967, ch. 297, § 12, 1967 Minn.Laws 465 (codified at Minn.Stat. § 474.12 (1978)) (industrial development bonds).

3. The federal statute that applies to this case, 31 U.S.C. § 3124 (1982) (formerly codified at 31 U.S.C. § 742), provides:

(a) Stocks and obligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except—
(1) a nondiscriminatory franchise tax, imposed on a corporation * * *.

The U.S. Supreme Court has stated that this statutory prohibition codified longstanding principles of constitutional law which preclude the states from taxing federal securities and income generated by them. *See Society for Savings v. Bowers,* 349 U.S. 143, 144, 75 S.Ct. 607, 608, 99 L.Ed. 950 (1955).

4. The Minnesota legislature repealed the exemptions for income on certain state obligations in 1983 in response to the *Memphis Bank* case. Act of May 20, 1983, ch. 213, 1983 Minn.Laws 613, 613–25.

The trial was bifurcated into a liability phase and a remedy phase. Pursuant to a stipulation by the parties, the court heard evidence regarding four banks for the 1979 tax year. The parties agreed that the trial court's conclusion on liability would be conclusive as to all tax years at issue and all of the plaintiff banks. The trial court found the tax unconstitutional under *Memphis Bank*. The trial court found the state liable for refunds of the taxes the banks paid on interest on federal obligations, with the amount to be determined during the remedy phase of the trial. At the close of the remedy phase, the court assessed the state's liability for refunds at a total of $285,750.00 for the four test banks during the test year.

On review, we agreed with the trial court that the tax was discriminatory under *Memphis Bank*, but further held that the banks were estopped from challenging the statute's constitutionality because they benefitted from the exemptions for state bond income which made the tax unconstitutional. *Cambridge State Bank v. Roemer*, 457 N.W.2d 716, 720 (Minn.1990) ("*Cambridge I* "). As to remedy, we concluded that *Memphis Bank* should be applied prospectively only, and that severance of the exemptions for interest income from state obligations was an appropriate remedy. *Id.* at 721–22.

The U.S. Supreme Court granted certiorari in *Cambridge I*, vacated the judgment, and remanded the case for reconsideration in light of its decision in *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). *Norwest Bank Duluth v. James*, — U.S. —, 111 S.Ct. 2881, 115 L.Ed.2d 1047 (1991). *Beam* held that when the Supreme Court "has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata." *Beam*, — U.S. at —, 111 S.Ct. at 2448. Upon reconsideration, we held that we were compelled by *Beam* to apply *Memphis Bank* retroactively, but we again denied the banks refunds on several grounds. *Cambridge State Bank v. James*, 480 N.W.2d 647 (Minn. 1992) ("*Cambridge II* "). First, we reaffirmed our estoppel holding, concluding that *Beam* allowed states to raise state procedur-

al bars to the otherwise required retroactive application of *Memphis Bank* and that the "acceptance-of-benefits" estoppel doctrine was one such procedural bar. *Id.* at 652. We also affirmed our holding that severance of the exemptions for income on state obligations was an appropriate remedy, citing *Beam* 's holding that the remedial decision is governed by state law when the case originates in state court. *Id.* at 653–54. We concluded again that the remedy of severance was "sufficient to cure the discriminatory tax." *Id.* at 655.

The U.S. Supreme Court again granted certiorari, vacated our *Cambridge II* judgment, and again remanded the case to us for reconsideration, this time in light of its decision in *Harper v. Virginia Department of Taxation*, — U.S. —, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). The Supreme Court's summary reconsideration order leaves the *Cambridge II* decision without force or effect. *State v. Hershberger*, 462 N.W.2d 393, 395 (Minn.1990). The Supreme Court's order indicates that the Court has found the intervening precedent "sufficiently analogous and, perhaps, decisive to compel re-examination of the case." *Henry v. City of Rock Hill*, 376 U.S. 776, 777, 84 S.Ct. 1042, 1043, 12 L.Ed.2d 79 (1964).

In *Harper*, the Virginia Supreme Court invalidated a state statute which taxed federal retirees' benefits while exempting from taxation benefits of state and local retirees. *Harper v. Virginia Dept. of Taxation*, 241 Va. 232, 401 S.E.2d 868, 870 (1991), *rev'd* — U.S. —, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). The Virginia court, however, gave only prospective effect to its decision that the tax was unconstitutional. *Id.* 401 S.E.2d at 873. After the U.S. Supreme Court vacated the decision and remanded it for reconsideration in light of *Beam*, the Virginia court reaffirmed its decision in all respects. *See Harper v. Virginia Dept. of Taxation*, 242 Va. 322, 410 S.E.2d 629 (1991). The U.S. Supreme Court again granted certiorari, reversed and remanded, addressing both retroactivity and remedial issues. *Harper*, — U.S. —, 113 S.Ct. 2510. Thus, our analysis turns on the application of *Harper* to the instant matter.

The Supreme Court's analysis of remedial issues in *Harper* affects our ruling in *Cambridge II*.[5] After finding the tax at issue in *Harper* unconstitutional, the Virginia Supreme Court had declined to order refunds for the federal retirees. *See Harper*, 401 S.E.2d at 874; 410 S.E.2d at 632. As we noted in *Cambridge II*, the U.S. Supreme Court has held that the remedial inquiry is one governed by state law where the case originates in state court. *Cambridge II*, 480 N.W.2d at 653 (citing *Beam*, —— U.S. at ——, 111 S.Ct. at 2443). In *Harper*, however, the Court reversed the Virginia court and remanded the decision with the directive that the state court measure the relief provided by the state's remedial scheme against federal due process principles. *Harper*, —— U.S. at ——, 113 S.Ct. at 2520. The Court cited the due process principles set out in *McKesson Corp. v. Division of Alcoholic Beverages*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) as controlling precedent. A closer look at *McKesson* is therefore instructive.

In *McKesson*, the Court considered the scope of a state's obligation to provide taxpayers retrospective relief for payment of an unconstitutional tax. The Florida Supreme Court had found that its state liquor excise tax scheme violated the commerce clause and enjoined future enforcement of a preferential tax rate for state products, but declined to order a refund or any other form of relief for taxes already paid under the unconstitutional statute. *Division of Alcoholic Beverages and Tobacco v. McKesson*, 524 So.2d 1000 (Fla.1988), *rev'd*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1991). The U.S. Supreme Court reversed, holding that the unlawful exaction of taxes is a deprivation of property under the due process clause for which a state must provide procedural protections. *McKesson*, 496 U.S. at 36, 110 S.Ct. at 2250. The Court held that states may choose to provide either a predeprivation or a postdeprivation procedure. A predeprivation procedure must allow taxpayers to sue to enjoin imposition of the tax prior to payment or to withhold payment and present their objections as defenses in a tax enforcement proceeding. *Id.* at 36–37, 110 S.Ct. at 2250. If the state opts for a postdeprivation procedure, however, it must provide one of the following "clear and certain" remedies: a refund of taxes unlawfully exacted, a retroactive tax on the benefitted taxpayers, or a combination of a partial refund and a partial retroactive assessment to create "in hindsight a nondiscriminatory scheme." *Id.* at 39–41, 110 S.Ct. at 2251–52.

In evaluating Florida's procedures, the Court concluded that because Florida had established various "sanctions and summary remedies" to encourage payment of taxes prior to resolution of disputes over the tax's validity, the state did not provide a *"meaningful"* opportunity for predeprivation relief and must therefore provide a "clear and certain remedy" for any unlawful exaction of taxes through its postdeprivation process. *Id.* at 38–39, 110 S.Ct. at 2251. The Court rejected the argument that equitable considerations, such as the state's good faith reliance on a presumptively valid statute, could override the constitutional requirement of retrospective relief. *Id.* at 44–49, 110 S.Ct. at 2254–57. The Court further held that the state's interest in financial stability could not justify a refusal to provide relief, but that its administrative costs and interest in avoiding serious economic dislocation could play a role in choosing and fine-tuning the relief to be provided. *Id.* at 49–51, 110 S.Ct. at 2256–58.

We reconciled our previous decisions with *McKesson* or found its analysis inapplicable to the *Cambridge* case for several reasons. First, we distinguished *McKesson* because it was a commerce clause case, rather than an intergovernmental tax immunity case like *Cambridge*. *Cambridge I*, 457 N.W.2d at 721; *Cambridge II*, 480 N.W.2d at 653–54. We reasoned that the tax at issue in *McKesson* harmed one of two groups of competitors, and that this harm was absent here; in *Cambridge* all of the banks paid the same tax and thus none suffered any *competitive* eco-

---

5. *Harper's* major effect on subsequent cases is the Court's holding that its application of a rule of federal law shall be given retroactive effect in all future cases. *Harper*, —— U.S. at ——, 113 S.Ct. at 2513. *See United Food and Commercial*

*Workers Int'l Union, AFL–CIO, Local No. 150–A v. NLRB*, 1 F.3d 24, 35 (D.C.Cir.1993). This holding has little effect on our decision in *Cambridge II*, however, as we applied the *Memphis Bank* decision retroactively in that decision.

nomic disadvantage. *Cambridge I,* 457 N.W.2d at 721; *Cambridge II,* 480 N.W.2d at 653. *Harper* clarifies that the U.S. Supreme Court considers *McKesson* controlling precedent in intergovernmental tax immunity cases as well, making the state's obligation to provide retrospective relief applicable to *Cambridge. See Harper,* —— U.S. at —— ——, 113 S.Ct. at 2519–20. After *Harper* we can no longer distinguish *McKesson* on the ground that it applies only to commerce clause cases.

■ Further, *Harper* holds that the existence of a predeprivation remedy which meets the tests set out in *McKesson* is a preliminary question which determines the remedy required for an unlawful tax under the Due Process Clause of the federal constitution. *Harper,* —— U.S. at ——, 113 S.Ct. at 2519. Both the Minnesota Department of Revenue and the respondent banks agree that after *Harper* the existence of a meaningful predeprivation remedy is a necessary precondition to denying a retroactive remedy on any state law theory. If there was a meaningful predeprivation procedure in Minnesota at the time the tax was paid, then we have the option of denying backward-looking relief and state law bars to relief may come into play. If those procedures did not exist or were not "meaningful" then we must design a "clear and certain" backward-looking remedy which creates in hindsight a nondiscriminatory tax scheme.[6]

■ We concluded in *Cambridge II* that even if *McKesson* did apply to this case, there was a form of predeprivation procedure

in place in Minnesota during the tax year at issue which satisfied the federal due process standards set out in *McKesson. Cambridge II* 480 N.W.2d at 651–52. We predicated our conclusions that the purely prospective relief of severance was adequate and that the banks were estopped from claiming refunds under a state law doctrine in part on the fact that a predeprivation procedure existed in Minnesota at the time these taxes were assessed. *Id.* at 652–54. We found that Minnesota provided taxpayers with the opportunity to challenge the tax statute in the tax court without first paying the taxes at issue.[7] Respondent banks, however, argue that the tax court procedure available in Minnesota in 1980 when the banks filed 1979 tax returns was not the *meaningful* opportunity for predeprivation relief required by *McKesson.* Given *Harper*'s clarification that *McKesson* directly controls this case, we must carefully reconsider whether a predeprivation remedy which satisfies *McKesson*'s requirements existed in Minnesota at the time the banks paid the tax.

In 1980, litigants challenging taxes in Minnesota were able to file for tax refunds in district court, but were required to pay the tax first. *See* Minn.Stat. § 290.50, subds. 1–2 (1980). Since 1977 the state has also had an administrative tax court with jurisdiction over all questions arising under the state's tax laws. Minn.Stat. ch. 271 (1992). Soon after the tax court's creation, however, we questioned its jurisdiction to decide constitutional issues.[8] We upheld the constitutionality of the administrative tax court itself in 1979, but cited as the saving feature of the

---

6. The constitutional standard set out in *McKesson* is rooted in the Due Process Clause requirement that an individual be given a hearing *before* being finally deprived of his property. *McKesson,* 496 U.S. at 36–37, 110 S.Ct. at 2250–51. The Supreme Court noted that many policy considerations support its opinions allowing states to deny a hearing until after a tax is paid. *Id.* at 37–38, 110 S.Ct. at 2250–51. The Court in *McKesson* simply held that if a state chooses that course, it must provide retrospective relief upon a subsequent determination that the tax was unlawfully exacted. *Id.* at 38–39, 110 S.Ct. at 2251–52.

7. There is some ambiguity in our *Cambridge II* opinion regarding whether our holding was for the 1979 tax year only or for all of the tax years

for which refunds are claimed. *Cambridge II,* 480 N.W.2d at 651. We examined the "1979–80 tax years" and concluded that "in each year at issue" Minnesota provided a predeprivation remedy. *Id.* The parties have always confined their arguments to the 1979 tax year; we are bound by the parties stipulation and thus analyze only the year which the parties stipulated would control the outcome for each year at issue.

8. In *Harris v. Commissioner of Revenue,* 257 N.W.2d 568 (Minn.1977) we upheld a tax court ruling on the constitutionality of a statute, but we noted that the tax court's jurisdiction to hear a constitutional challenge to state statutes had not been challenged by either party. *Id.* at 569 n. 1. We clarified that our decision intended no comment on that issue. *Id.*

statutory scheme creating the tax court, the fact that taxpayers had the option to elect a judicial remedy by filing in district court. *Wulff v. Tax Court of Appeals*, 288 N.W.2d 221, 224–25 (Minn.1979).

In September of 1980, we held that the tax court did not have original jurisdiction over constitutional issues, but that the tax court could consider constitutional claims first transferred from district court.[9] *Matter of McCannel*, 301 N.W.2d 910, 919 (Minn.1980); *see also Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138, 139 n. 1 (Minn.1980). Finally, in 1984 we affirmed the constitutionality of a procedure whereby the tax court could obtain jurisdiction over constitutional issues by transferring the case to the district court and having the district court transfer the case back to the tax court. *Erie Mining Co. v. Commissioner of Revenue*, 343 N.W.2d 261, 264 (Minn.1984).

With this history in mind, the existence of some avenue for challenging the tax before paying 1979 taxes in early to mid–1980 can be asserted, but only with hindsight. Given that our 1977 decision in *Harris* had called into question the tax court's jurisdiction over constitutional issues, and that the issue remained unsettled, we do not think this mechanism provided the "meaningful opportunity" called for by *McKesson*. In contrast, a scheme for postdeprivation review clearly existed in early 1980 when the banks would have filed a lawsuit challenging the constitutionality of the tax. A state statute provided for refund actions in district court to recover taxes unlawfully collected. Minn.Stat. § 290.50 (1980). In light of the uncertainty regarding the reach of the tax court's jurisdiction and the clear availability of the statutory refund procedure, we cannot assert that the meaningful predeprivation remedy required by *McKesson* existed in early to mid–1980.

9. Based upon the record before us, the test banks apparently filed their taxes before *McCannel* was released. As the parties have raised arguments dealing with the remainder of 1980, however, we have evaluated the remedies available during the entire year.

10. The state can only cite one action in which that procedure was followed prior to *Erie, Naga-*

If the banks decided whether to pay the tax or challenge it after September of 1980, when *McCannel* held that the tax court did not have jurisdiction over constitutional issues, the existence of a meaningful predeprivation remedy is even more questionable. The state argues that the banks would still have been able to have their case heard in tax court without prepayment, stating that after *McCannel* the tax court continued to consider cases raising constitutional issues which were filed in tax court before the *McCannel* decision was released. The state cites two such cases from 1981 and 1982. The state also cites a 1981 case, however, *Fussard v. Commissioner of Revenue*, No. 3183, 1981 WL 1485, at *6 (Minn.Tax Ct. 1981), in which the tax court ruled that cases directly questioning the validity of a state statute per se would be dismissed or referred to district court. That is precisely the type of case at issue; thus the banks' challenge would likely have been either dismissed or referred to district court. Dismissal of the lawsuit is hardly a meaningful predeprivation remedy.

The state also argues that the procedure for transfer of cases raising constitutional issues from tax court to district court and back to the tax court was practiced immediately after the *McCannel* decision. There are two problems with the state's argument. First, we did not affirm the constitutionality of that procedure until 1984 in the *Erie* case.[10] *See Soo Line Railroad Co. v. Commissioner of Revenue*, 377 N.W.2d 453, 456 n. 1 (Minn.1985). Second, the state has not shown that such a procedure could be followed without paying the tax upon transfer to district court.

In conclusion, during the latter part of 1980 the applicability of a tax court proceeding to the type of case at issue, a per se challenge to a state tax statute, was doubtful

*raja v. Commissioner of Revenue*, 352 N.W.2d 373 (Minn.1984). The *Nagaraja* case itself was filed as a refund action after taxes were paid. The banks' counsel submitted a copy of the state's brief in *Nagaraja* showing that the state itself argued that the Tax Court lacked jurisdiction to hear a constitutional challenge.

after our decision in *McCannel.* Other uncertainties after *McCannel* also call into question the adequacy of a tax court proceeding as a predeprivation remedy. It is unclear, for example, whether the tax court would have dismissed the suit or used the transfer procedure that we later spelled out in *Erie* and, if it used the transfer procedure, whether the banks would have been required to pay the tax incident to the transfer to district court where prepayment is a prerequisite to litigation. Thus our conclusion that no meaningful predeprivation remedy existed holds for all of 1980.

The existence of the tax refund statute in Minnesota provides further support for our decision. To rely on the banks' use of the refund statute to now deny them a remedy would effectively deny the banks a meaningful hearing without adequate notice. Prior to the *McKesson* decision, taxpayers had no notice that they were required to take advantage of any predeprivation procedures in order to qualify for a refund. Even if there was a predeprivation remedy in 1980, the banks did not know when they chose between filing for a refund in district court and filing in tax court, that in choosing a refund action, they were foreclosing their right to recovery.[11] Moreover, the tax refund statute did not have a requirement that the tax be paid under protest or that the taxpayer attempt to first take his or her claim to tax court. *See Brinkerhoff–Faris Trust and Sav. Co. v. Hill,* 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930) (finding due process violation when Missouri Supreme Court denied remedy to taxpayer by holding that taxpayer failed to take advantage of administrative remedies when court had previously found agency lacked power to hear the type of case at issue).

Having concluded that Minnesota did not provide a meaningful predeprivation remedy in 1980, *McKesson* commands that we design a clear and certain remedy which creates in hindsight a nondiscriminatory scheme. *McKesson,* 496 U.S. at 39–40, 110 S.Ct. at 2251–52. We have three choices: a refund of taxes paid on federal obligation income, a retroactive tax on exempted state obligation income or a combination of the two approaches. *Id.* at 40–41, 110 S.Ct. at 2252–53. Nothing in *Beam, Harper* or *McKesson* precludes us from considering equitable factors in designing the appropriate remedy. Such considerations may not result in a denial of the meaningful backward-looking remedy, but we may consider administrative costs in the selection and fine-tuning of the relief. *McKesson* 496 U.S. at 50–51, 110 S.Ct. at 2257–58.

We have considered each of the three possible remedies and choose to affirm the trial court's conclusion that all plaintiff banks are entitled to refunds of the unconstitutional tax on interest earned on federal obligations for all tax years in question. We noted in *Cambridge I* that the Minnesota Department of Revenue stipulated that it will not collect a retroactive tax on income from exempted state obligations. *Cambridge I,* 457 N.W.2d at 721. While we stand by our conclusion that the Revenue Department's stipulation could not limit our power to fashion an appropriate remedy, the stipulation is only one of the possible difficulties inherent in collecting a retroactive tax. Furthermore, the United States Supreme Court has not spoken clearly with regard to the constitutionality of a retroactive tax.[12] These problems are also inherent in a combination remedy; such a remedy would necessarily include a retroactive tax. While we recognize that this refund

---

**11.** This issue did not arise in *McKesson* itself because the Court there found that taxpayers did not have a meaningful predeprivation remedy, thus a remedy was due regardless of whether it was required under Florida's tax refund statute.

**12.** In *McKesson,* the Court noted that it had previously held

that the retroactive assessment of a tax increase does not necessarily deny due process to those whose taxes are increased, though

beyond some temporal point the retroactive imposition of a significant tax burden may be "so harsh and oppressive as to transgress the constitutional limitation," depending on "the nature of the tax and circumstances in which it is laid."

496 U.S. at 40 n. 23, 110 S.Ct. at 2252 n. 23 (citations omitted). We cited this language in *Cambridge II* and concluded that it would be unfair to impose and collect a curative tax on the banks in this case. *Cambridge II,* 480 N.W.2d at 654.

will place a serious burden on the state, we also note that the state has collected the unconstitutional tax for many years for which the banks will not recover due to the statute of limitations on tax refund actions.

We affirm the trial court's order from the remedial phase of the trial, including the court's conclusions as to all expense deductions at issue and the entitlement to interest. The trial court determined the amount of the refund owed to each of the test banks for the 1979 tax year. On remand, the trial court should calculate the refund owed to the test banks for the remaining tax years and to the remaining plaintiff banks for all tax years at issue. Having given consideration to equitable factors in fine-tuning this refund remedy, we believe that the administrative and financial burden on the state justify allowing the state to pay the refund over the same period of time in which the tax was collected. Given that the tax was collected over a period of four years, we order that the trial court allow the state to administer its refund over a four-year period as well.

Affirmed and remanded to the trial court for the calculation of a refund schedule consistent with this opinion.

PAGE, Justice (concurring specially).

I would have reached the result the court reaches today through its elaborate analysis of *Cambridge I* and *Cambridge II* and relevant Supreme Court decisions more simply and directly. The refund statute in existence at the time the taxes were paid, Minn.Stat. § 290.50, subd. 5(b) (1978), provides: "Notwithstanding any other provision of law to the contrary, in the case of any overpayment the commissioner * * * shall refund any balance of more than one dollar * * * if the taxpayer shall so request." The language of this statute is clear and free from ambiguity and should be followed. Having determined that the taxpayers here paid taxes in excess of the amount legally due for the tax years in question, we should simply require compliance with the statute.